UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**FILED**

May 29, 2026

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____**CM**_____

DEPUTY

| | | |
|---|---|---|
| AMBER POCRNICH, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF STEPHEN POCRNICH, DECEASED, GARY POCRNICH, AND NOAH POCRNICH, | § § § § § § | |
| Plaintiffs, | § | |
| v. | § | 5:25-CV-01815-MA |
| | § | |
| UNITED STATES OF AMERICA, | § § | |
| Defendant. | § § | |

**OPINION AND ORDER**

The Court now considers Defendant The United States of America's ("United States") Motion to Dismiss;[1] Plaintiffs Amber Pocrnich, individually and on behalf of the estate of Stephen Pocrnich, deceased, Gary Pocrnich, and Noah Pocrnich's ("Plaintiffs") Response and Objections;[2] Defendant's Reply;[3] Plaintiffs' Motion for Leave to File Surreply;[4] and the United States' Response.[5] After considering the motions, record, and relevant authorities, the Court **DENIES** Plaintiffs' motion for leave to file surreply and **DENIES** the United States' motion to dismiss.

### I.    FACTUAL BACKGROUND

This is a medical negligence action for the wrongful death of Stephen Pocrnich ("Decedent"), which was allegedly caused by "negligent acts and/or omissions" of medical staff at Brooke Army Medical Center ("BAMC") in San Antonio, Texas.[6] BAMC is a medical facility

---

[1] Dkt. No. 17.
[2] Dkt. No. 19.
[3] Dkt. No. 20.
[4] Dkt. No. 21.
[5] Dkt. No. 22.
[6] Dkt. No. 15, at 1–4.

owned and operated by the Defense Health Agency, a subordinate agency of the United States.[7] Plaintiffs Amber Pocrnich, Decedent's surviving spouse, and Gary and Noah Pocrnich, Decedent's children and wrongful death beneficiaries, assert this claim under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1) and 2674.[8]

Assuming the facts alleged in Plaintiffs' amended complaint to be true, Decedent, a 50-year-old male, presented to the emergency room of BAMC on February 11, 2024, "complaining of an intense headache in the right temporal lobe, which had persisted for several days."[9]

The physician on duty evaluated Decedent for hemodynamic instability, signs of neurological deficit, migraine, tension headache, hypertensive emergency, and intracranial hemorrhage, and ordered a CT scan.[10] When the CT scan showed no evidence of intracranial hemorrhage or ischemic process, the physician on duty concluded that Decedent's symptoms were likely attributable to sinusitis and recommended that Decedent consult a primary care physician within the next week.[11]

Decedent was discharged; however, he returned to the BAMC emergency room at 10:31 p.m. the next night, complaining of a worsening, "severe" headache and nasal congestion.[12] Decedent was assessed by Dr. Cayla Fappiano ("Dr. Fappiano") at 1:20 a.m.[13] Dr. Fappiano concluded that Decedent's condition was stable, and that Decedent was not demonstrating any neurological deficits.[14] Dr. Fappiano ordered a CT scan for evaluation of possible sinus

---

[7] Dkt. No. 15, at ¶ 3.2.
[8] Dkt. No. 15, at ¶ 3.1.
[9] Dkt. No. 15, at ¶ 4.1.
[10] Dkt. No. 15, at ¶ 4.1.
[11] Dkt. No. 15, at ¶ 4.1.
[12] Dkt. No. 15, at ¶ 4.2.
[13] Dkt. No. 15, at ¶ 4.2.
[14] Dkt. No. 15, at ¶ 4.2.

thrombosis, i.e., a blood clot in the brain.[15] This scan was performed at 4:17 a.m.[16] The report on this scan was prepared by resident Dr. Sebastian Galante ("Dr. Galante") finding "no acute hemorrhage" and concluding that the scan results were "suggestive of multifocal dural venous thrombosis."[17] Plaintiffs allege that, in fact, the scan results revealed a subarachnoid hemorrhage, i.e., an intracranial brain bleed.[18]

Dr. Galante's report was endorsed by attending radiologist Dr. Jay Chaudhuri ("Dr. Chaudhuri").[19] Based on this report, the attending emergency-room physician ordered Decedent to be administered Heparin, an anticoagulant blood thinner contraindicated for subarachnoid hemorrhage.[20] Decedent was administered the Heparin at 6:13 a.m.[21]

An MRI scan was subsequently ordered. At approximately 9:50 a.m., Decedent was taken to a holding area to await his scan.[22] While waiting, Decedent began to complain of pain in his head, began slowly slouching in his wheelchair, and became unresponsive.[23] A Code Blue was called at 10:30 a.m.[24] The code team assessed that Decedent was suffering a "tonic-clonic" seizure and intubated him.[25] An emergency scan was ordered and revealed a "significantly worsened," "extensive hemorrhage" in Decedent's brain.[26] Decedent was administered Protamine in an attempt to reverse the effect of the Heparin, and Decedent was taken to the intensive care unit.[27] Decedent's condition failed to improve and instead continued to deteriorate throughout the day.[28]

---

[15] Dkt. No. 15, at ¶ 4.2.
[16] Dkt. No. 15, at ¶ 4.2.
[17] Dkt. No. 15, at ¶ 4.2.
[18] Dkt. No. 15, at ¶ 4.3.
[19] Dkt. No. 15, at ¶ 4.3.
[20] Dkt. No. 15, at ¶ 4.3.
[21] Dkt. No. 15, at ¶ 4.3.
[22] Dkt. No. 15, at ¶ 4.4.
[23] Dkt. No. 15, at ¶ 4.4.
[24] Dkt. No. 15, at ¶ 4.4.
[25] Dkt. No. 15, at ¶ 4.4.
[26] Dkt. No. 15, at ¶ 4.5.
[27] Dkt. No. 15, at ¶ 4.6.
[28] Dkt. No. 15, at ¶ 4.6.

On February 14, 2024, at approximately 1:45 p.m., Decedent was determined to be brain dead.[29] An autopsy performed on February 15, 2024, determined that the cause of death was "an acute subarachnoid hemorrhage result[ing] in infarction (the death of tissue due to a lack of blood supply), brainstem compression, edema (swelling caused by a buildup of fluid in the brain), and herniation (displacement of brain tissue due to the increased pressure in the brain)."[30]

## II.   PROCEDURAL HISTORY

Plaintiffs submitted a Form 95 Administrative Claim to the Defense Health Agency on May 19, 2025, and received a response from the claims officer on May 29, 2025.[31] On June 13, 2025, Plaintiff Amber Pocrnich submitted an additional Form 95 Administrative Claim to the Defense Health Agency on behalf of the Decedent's estate.[32] Plaintiffs allege that all claims were acknowledged as received by the Defense Health Agency as of June 13, 2025, but that no letter formally denying those claims has been issued.[33] Because more than six months have elapsed since the United States confirmed receipt of Plaintiffs' administrative claims, Plaintiffs have satisfied the jurisdictional prerequisites to commence this action in federal court.[34]

Plaintiffs filed their original complaint on December 19, 2025, asserting claims for ordinary negligence and, in the alternative, willful and wanton negligence for BAMC medical staff's alleged failure to properly identify a subarachnoid hemorrhage and subsequent administration of Heparin, which allegedly caused Decedent's death[35]

---

[29] Dkt. No. 15, at ¶ 4.6.
[30] Dkt. No. 15, at ¶ 4.7.
[31] Dkt. No. 15, at ¶ 3.9.
[32] Dkt. No. 15, at ¶ 3.9.
[33] Dkt. No. 15, at ¶ 3.9.
[34] *See* 28 U.S.C. § 2675(a).
[35] Dkt. No. 15, at 8–9.

The United States filed its first Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(1), "and alternatively under Rule 12(b)(6)," on February 27, 2026.[36] Plaintiffs filed an amended complaint in lieu of a response in accordance with Federal Rule of Civil Procedure 15(a)(1)(B) on March 13, 2026,[37] thereby mooting the United States' initial Motion to Dismiss. The United States filed the instant Partial Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(1) and (b)(6) on March 27, 2026.[38] Plaintiffs filed a response on April 10, 2026,[39] and the United States filed a reply on April 17, 2026.[40] One week after the United States filed its reply, Plaintiffs filed a Motion for Leave to File Surreply, arguing that the United States' reply brief raised new Erie-related arguments to which Plaintiffs should be entitled to respond.[41] In response, the United States denies that it raised new arguments and urges the Court to deny Plaintiffs' motion for leave to file a surreply.[42] Both motions are now ripe for consideration.

### III.   JURISDICTIONAL FRAMEWORK AND APPLICABLE RULE 12 STANDARD

The United States does not dispute or admit in its motion that a misinterpretation of the CT scan occurred, or that it led to the administration of a contraindicated coagulant that resulted in Decedent's death. Rather, the United States contends that, because these events allegedly occurred while Decedent was receiving emergency care, negligence claims against it are barred pursuant to Texas Civil Practices and Remedies Code § 74.153 unless Plaintiffs can plead that they occurred as a result of willful and wanton conduct. Accordingly, the United States asserts that Plaintiffs are

---

[36] Dkt. No. 11.
[37] Dkt. No. 15.
[38] Dkt. No. 17.
[39] Dkt. No. 19.
[40] Dkt. No. 20.
[41] Dkt. No. 21.
[42] Dkt. No. 22.

statutorily and therefore jurisdictionally barred from pleading their viable ordinary negligence claim under both Rule 12(b)(1) and Rule 12(b)(6).[43]

Under the FTCA, a plaintiff has standing to bring a tort claim against the United States when the claim is:

> [1] against the United States, [2] for money damages, ... [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.[44]

The sixth element—whether the United States would be liable to Plaintiffs for ordinary negligence under Texas law—is at issue in this case. Ordinarily, a court commits an *ultra vires* act when it rules on the merits before establishing jurisdiction.[45] However, all elements of a meritorious FTCA claim are jurisdictional, such that "a plaintiff must plausibly allege all six FTCA elements not only to state a claim upon which relief can be granted but also for a court to have subject-matter jurisdiction over the claim."[46] A court may resolve an issue on a motion under Rule 12(b)(1), Rule 12(b)(6), or both when the merits and jurisdiction issues are "intertwined."[47]

### a. 12(b)(1)

Generally, dismissal is proper under Rule 12(b)(1) "when the court lacks the statutory or constitutional power to adjudicate the case."[48] In ruling on a motion under Rule 12(b)(1), the Court "has the power to dismiss for lack of subject-matter jurisdiction on any one of three separate bases:

---

[43] Dkt. No. 17, at 1.
[44] *Brownback v. King*, 592 U.S. 209, 212 (2021) (citing *FDIC v. Meyer*, 510 U.S. 471, 477 (1994) (quoting 28 U.S.C. § 1346(b)); *see also* Robledo v. United States, 147 F.4th 515, 519 (5th Cir. 2025) (citing 28 U.S.C. § 1346(b)(1)).
[45] *See Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 101–102 (1998).
[46] *Brownback*, 592 U.S. at 217-18 (internal citations omitted); *see also Robledo*, 147 F.4th at 519.
[47] *C.M. v. United States*, 672 F. Supp. 3d 288, 319 (W.D. Tex. 2023) (internal citations omitted); *see also Brownback*, 592 U.S. at 217 (internal citations omitted).
[48] *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998).

(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."[49] "Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction— its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."[50] In short, although the plaintiff "constantly bears the burden of proof that jurisdiction does in fact exist,"[51] no presumption of truthfulness attaches to a plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.[52]

Courts generally construe waivers of sovereign immunity narrowly and resolve ambiguities in the government's favor.[53] However, "unduly generous interpretations of the exceptions to the FTCA run the risk of defeating the central purpose of the FTCA."[54] Thus, the usual canon favoring the sovereign does not apply in a way that expands those exceptions, and courts "do not construe exceptions to the FTCA in favor of any particular party." [55]

### b.  12(b)(6)

To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."[56] This does not require detailed factual allegations, but it does require "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of

---

[49] *Freeman v. United States*, 556 F.3d 326, 334 (5th Cir. 2009) (internal citations omitted).
[50] *Williamson v. Tucker*, 645 F.2d 404, 412–13 (5th Cir. 1981).
[51] *Robledo*, 147 F.4th at 519 (quoting *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam)).
[52] *Williamson*, 645 F.2d at 413.
[53] C.M., 672 F. Supp.3d at 322 (citing *Joiner v. United States*, 955 F.3d 399, 404 (5th Cir. 2020)).
[54] C.M., 672 F. Supp.3d at 322.
[55] *Id.* (quoting *Kosak v. United States*, 465 U.S. 848, 853 n.9 (1984)).
[56] *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007), *cert. denied*, 552 U.S. 1182 (2008) (internal quotations omitted).

action."[57] Courts first disregard from their analysis any conclusory allegations as not entitled to the assumption of truth,[58] but regard well-pled facts as true, viewing them in the light most favorable to the plaintiff.[59] Courts then undertake the "context-specific" task of determining whether the remaining well-pled allegations give rise to an entitlement to relief that is plausible, rather than merely possible or conceivable.[60] The focus is not on whether the plaintiff will ultimately prevail, but whether that party should be permitted to present evidence to support adequately asserted claims.[61]

Courts are to give a liberal construction to the pleadings and disentitle plaintiffs from offering evidence to clarify and support their theories of liability only if there is no basis for liability.[62] However, the standard is only "to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success."[63] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged."[64] The complaint must plead every material point necessary to sustain recovery; dismissal is proper if the complaint lacks a requisite allegation.[65]

The information a court may consider when evaluating whether a plaintiff's complaint survives a Rule 12(b)(6) motion to dismiss is limited to: (1) facts set forth in the complaint, (2)

---

[57] *Twombly*, 550 U.S. at 555.
[58] *See id.* at 678–79.
[59] *Id.*
[60] *See id*. at 679–80.
[61] *Id.* at 563 n.8.
[62] *See Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312–13 (5th Cir. 2002); *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999) (per curiam) (citation omitted) ("[T]he court should not dismiss the claim unless the plaintiff would not be entitled to relief under any set of facts or any possible theory that he could prove consistent with the allegations in the complaint.").
[63] *Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012) (quoting *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010))
[64] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
[65] *Rios v. City of Del Rio*, 444 F.3d 417, 421 (5th Cir. 2006); *accord Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir. 1995).

documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201.[66]

### c. Analysis

The United States argues that Rule 12(b)(1) is the proper standard because whether "§ 74.153 applies . . . is a legal question implicating Plaintiffs' Article III standing" rather than a challenge to the merits of Plaintiffs' claims.[67] The United States asserts that the Court should evaluate Plaintiffs' pleading under Rule 12(b)(1) because the core arguments of their motion concern whether it is statutorily shielded by § 74.153(a), which imposes a heightened "willful and wanton" negligence standard for malpractice claims arising from qualifying emergency medical care in Texas.[68] Thus, the United States contends this is purely an issue of standing because its motion does not concern the question of "whether the alleged medical care at issue may constitute medical negligence."[69] The United States cites *Robledo v. United States*, in which both the Fifth Circuit and the district court evaluated a similar FTCA medical-negligence claim under Rule 12(b)(1), in support of its argument.[70]

The United States' arguments are difficult to reconcile with governing law. In substance, the instant motion to dismiss asks the Court to determine whether Plaintiffs have alleged facts showing that the United States, "if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."[71]As the Supreme Court and Fifth

---

[66] *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019).
[67] Dkt. No. 20, at 2.
[68] TEX. CIV. PRAC. & REM. CODE § 74.153(a).
[69] Dkt. No. 20, at 2, 9–11.
[70] *Robledo*, 147 F.4th at 519.
[71] 28 U.S.C. § 1346(b)(1).

Circuit have made clear, "it is not possible to extricate the jurisdictional question from the merits claim" in an FTCA action where jurisdiction turns on the viability of the claim itself.[72]

Even if the Court is not required to choose between standards, Fifth Circuit precedent indicates that Rule 12(b)(6)'s merits framework is the better approach where the defendant does not mount a factual attack on jurisdiction.[73] *Robledo* does not compel a different conclusion. The Fifth Circuit in *Robledo* conducted its analysis under Rule 12(b)(1) because that was the posture accepted by the district court, which had provided no explanation for its decision to apply Rule 12(b)(1) instead of Rule 12(b)(6).[74] If anything, *Robledo* acts against the United States' argument, as the Circuit reversed on the ground that the purportedly "jurisdictional" issue of whether § 74.153(a) applied to the "emergency" procedure in dispute was, in reality, a disputed question of fact.[75] In light of this, the Court concludes that Rule 12(b)(6) provides the more appropriate framework and proceeds with analysis accordingly.

### a. Objections to Extra-Pleading Medical Records

The United States attached to its original motion the emergency room medical records from Decedent's visits to the hospital on February 11, 2025, and February 12, 2025, which they incorporate in the instant motion.[76] The United States argues the records objectively demonstrate that Decedent received "emergency" care under § 74.153.[77] The United States argues that these

---

[72] *See Brownback*, 592 U.S. at 217 (internal citations omitted); *see also Pickett v. Texas Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013, 1031 (5th Cir. 2022) (cleaned up)(internal citations omitted).

[73] *Montez v. Dep't of Navy*, 392 F.3d 147, 150 (5th Cir. 2004); *M.D.C.G. v. United States*, 956 F.3d 762, 768–69 (5th Cir. 2020); *see also Pickett*, 37 F.4th at 1030 (citing *Williamson*, 645 F.2d at 415 ("[W]here the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper course … is to find that jurisdiction exists and deal with the objection as a direct attack on the merits")).

[74] *See H.R. v. United States*, No. W:23-CV-00796-ADA-JCM, 2024 WL 4448844 (W.D. Tex. Sept. 17, 2024), *report and recommendation adopted*, No. 6:23-CV-00796-ADA-JCM, 2024 WL 4447246 (W.D. Tex. Oct. 7, 2024), *rev'd and remanded sub nom. Robledo v. United States*, 147 F.4th 515 (5th Cir. 2025).

[75] *Robledo*, 147 F.4th at 521.

[76] *See* Dkt. Nos. 11-1; 17, at 7–9.

[77] Dkt. No. 17, at 7–9.

documents are per se admissible under Rule 12(b)(1) as an "undisputed fact" capable of resolving a "disputed" jurisdictional fact, or permissibly admissible under Rule 12(b)(6) as "an adjudicative fact that is not subject to a reasonable dispute" under Federal Rule of Evidence 201.[78]

Plaintiffs do not dispute the authenticity of the medical records the United States provides.[79] Instead, Plaintiffs object to the United States' inclusion of Decedent's medical records, which Plaintiffs assert were not attached to or specifically referenced in Plaintiffs' Complaint, on the ground that the United States offers those records to support its interpretation of facts that remain "definitively in dispute" rather than to establish objective facts.[80]

The Court construes Plaintiffs' objections as a motion to strike extrinsic evidence and proceeds with analysis accordingly.

The Court agrees that the United States relies on the medical records to advance a merits-based argument that the care Decedent received falls within a statutory exemption to Plaintiffs' ordinary negligence claim.[81]  The Court will therefore consider the records only to the extent they reflect the objective timing and course of Decedent's evaluation and treatment at BAMC, but declines to credit the United States' substantive interpretation of those records or its conclusions regarding the nature of the care provided. Accordingly, Plaintiffs' request to strike the United States' exhibits attached to its motion to dismiss is **GRANTED IN PART** and **DENIED IN PART.**

---

[78] Dkt. No. 17, at 7.
[79] *See* Dkt. No. 19, at 17.
[80] Dkt. No. No. 19, at 17 n.8; *see also* Dkt. No. 16, at 2, 17–18.
[81] *See* Dkt. No. 17, at 7–9.

## IV.    DISCUSSION

### a.  Motion to File Surreply

The Court turns first to consider Plaintiffs' Motion for Leave to File a Surreply. The Court's Local Rules do not ordinarily permit the filing of surreplies.[82] "Surreplies are heavily disfavored by courts."[83] Surreplies are frequently a reiteration of arguments already before the Court, delay resolution of the motion, and are often little more than strategic attempts to have the last word on an issue.[84] Accordingly, the movant seeking to file a surreply must "demonstrate exceptional or extraordinary circumstances warranting the relief sought. In other words, in seeking leave to file a surreply, a party must identify the new issues, theories, or arguments which the United States allegedly raised for the first time in its reply brief."[85]

Plaintiffs seek leave to file a surreply to address the United States' citation in its reply to *Hux v. Southern Methodist University*,[86] purportedly to advance the argument that the Court is bound to follow Texas intermediate appellate interpretations of § 74.153 that are favorable to the United States.[87] The United States responds that it cited *Hux* only to rebut Plaintiffs' assertion that the Fifth Circuit has "rejected" or otherwise overturned those Texas court decisions.[88]

A surreply is not warranted. The record reflects that the United States misunderstood Plaintiffs' reliance on Fifth Circuit precedent as suggesting that federal courts literally "modify" or "reshape" state court rulings.[89] To the extent the United States' briefing could be read to

---

[82] *See* W.D TEX. LOCAL RULE CV-7(e)–(f).
[83] *Weems v. Hodnett*, No. 10-CV-1452, 2011 WL 2731263, at *1 (W.D. La. July 13, 2011) (collecting cases); *accord Makhlouf v. Tailored Brands, Inc.*, No. 4:16-cv-0838, 2017 WL 1092311, at *5 (S.D. Tex. Mar. 23, 2017) (collecting cases).
[84] *Weems*, 2011 WL 2731263, at *1.
[85] *Id.* (citations omitted).
[86] 819 F.3d 776 (5th Cir. 2016).
[87] Dkt. No. 21, at 1–2.
[88] Dkt. No. 22, at 2–4.
[89] Dkt. No. 20, at 6–7.

overstate the force of intermediate state court decisions favorable to it, the principles governing the related *Erie* analysis are so well-settled that it is difficult to believe that the United States could plausibly argue that it imposes a binding directive on the Court, particularly where there exists a minor divergence on key statutory interpretation among the state intermediate courts.[90] Accordingly, Plaintiffs' Motion for Leave to File Surreply is **DENIED**.

### b. Motion to Dismiss

Neither Plaintiffs nor the United States address the question of whether the medical staff at BAMC committed acts of ordinary negligence when they misdiagnosed Decedent's subarachnoid hemorrhage or administered medication contraindicated for his actual condition.[91] Rather, the parties' central dispute turns on whether the care that Decedent received was "emergency medical care" exempted from ordinary liability claims under § 74.153(a) of the Texas Civil Practice and Remedies Code. This statute provides:

> Except as provided by Subsection (b), in a suit involving a health care liability claim against a physician or health care provider for injury to or death of a patient arising out of *the provision of emergency medical care* in a hospital emergency department, in an obstetrical unit, or in a surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department, the claimant bringing the suit may prove that the treatment or lack of treatment by the physician or health care provider departed from accepted standards of medical care or health care only if the claimant shows by a preponderance of the evidence that the physician or health care provider, with willful and wanton negligence, deviated from the degree of care and skill that is reasonably expected of an ordinarily prudent physician or health care provider in the same or similar circumstances.[92]

Section 74.153's elevated liability threshold does not apply to:

---

[90] *Compare Turner v. Franklin*, 325 S.W.3d 771 (Tex. App. 2010) *with Crocker v. Babcock*, 448 S.W.3d 159 (Tex. App. 2014).
[91] *See* Dkt. Nos. 17, at 5; 19, at 14–17; 20, at 9.
[92] TEX. CIV. PRAC. & REM. CODE § 74.153(a) (emphasis added).

(1) medical treatment provided after the patient is stabilized and receiving medical care or treatment as a nonemergency patient;

(2) medical care or treatment that is unrelated to a medical emergency; or

(3) a physician or health care provider whose negligent act or omission proximately causes a stable patient to require emergency medical care.[93]

The Texas Civil Practices and Remedies Code defines "emergency medical care" as:
bona fide emergency services provided after the sudden onset of a medical or traumatic condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of *immediate* medical attention could reasonably be expected to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part. The term does not include medical care or treatment that occurs after the patient is stabilized and is capable of receiving *medical treatment* as a nonemergency patient or that is unrelated to the original medical emergency.[94]

The United States cites the Texas Fifth Court of Appeals' opinion in *Turner v. Franklin*, in which the intermediate court held that § 74.153 applies to "any actions or efforts undertaken in a good faith effort to diagnose or treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions . . . during the time period and under the circumstances specified . . . after the sudden onset of a medical or traumatic condition manifesting itself by acute symptoms of sufficient severity.[95] The United States contends that because Decedent presented with "severe" head pain that was a potential indicator of numerous medical emergencies, "[o]nce [Decedent] went to the ER . . . all subsequent treatments and diagnoses, whether they indicated [Decedent] was stable or not,

---

[93] TEX. CIV. PRAC. & REM. CODE § 74.153(b) (cleaned up).
[94] TEX. CIV. PRAC. & REM. CODE § 74.001(a)(7) (emphasis added).
[95] *Turner*, 325 S.W.3d at 777–78 (quoting TEX. CIV. PRAC. & REM. CODE § 74.001(a)(7)).

constituted 'emergency services.'"[96] The United States further argues that no exception to § 74.153 applies because Decedent was never formally "stabilized" or moved to a non-emergency setting and because all the treatment he received was related to his medical emergency.[97]

Plaintiffs argue that § 74.153's applicability turns on "what the providers actually did, when they did it, and what [Decedent's] clinical status was at the time of the specific act of negligence at issue,"[98] not the seriousness of the condition or symptoms that a patient presents with or the fact that a treatment occurred in an emergency room setting.[99] Because Decedent was treated as "stable" for the three hours before Dr. Fappiano's examination and the three additional hours before he underwent his CT scan on February 13, 2024, Plaintiffs argue that his illness only became an emergency due to treatment that occurred as a result of Dr. Galante and Dr. Chaudhuri's misdiagnosis of his condition.[100] Because of this, Plaintiffs assert that whether Decedent was receiving emergency care is a fact-intensive merits question that cannot be decided at the motion-to-dismiss stage.[101]

The Court finds both parties' focus on the nature and severity of Decedent's medical condition informs but does not dispose of the issue. Both the Fifth Court of Appeals and the Fifth Circuit expressly cautioned against "retrospective" determinations that care provided for a condition categorically falls under § 74.153's protection.[102] When a patient presents to the emergency room, it is often the case that neither the patient nor the medical providers are capable

---

[96] Dkt. No. 17, at 11.

[97] Dkt. No. 17, at 13–16.

[98] Dkt. No. 19, at 12.

[99] Dkt. No. 19, at 3–6. Plaintiffs also raise the argument that Defendant's motion to dismiss "asserts that the patient's underlying medical condition alone, not the care provided." Dkt. No. 19, at 10. This is a mischaracterization of Defendant's argument, which centered on the patient's apparent condition (e.g., presenting symptoms) when they arrive at the emergency room, not the underlying medical diagnosis causing those conditions. *See* Dkt. No. 17, at 10–11.

[100] Dkt. No. 19, at 6–8.

[101] Dkt. No. 19, at 15–17.

[102] *Turner*, 325 S.W.3d at 778; *Robledo*, 147 F.4th at 520–21.

of assessing the full extent of the condition, even when certain symptoms might indicate an emergency condition. Emergency room staff must screen incoming patients quickly to identify conditions that require immediate intervention. As numerous state intermediate courts have held, these initial assessments constitute emergency medical care regardless of whether they result in a diagnosis of a non-emergency condition or a determination that a patient is "stable."[103]

However, the Court is not persuaded that all subsequent diagnostic efforts constitute the provision of emergency medical care, even when they occur physically in the emergency room. Section 74.153 covers the "provision of emergency medical care in a hospital emergency department," not the provision of *any* or *all* medical care provided in an emergency department. Both the statutory definition of "emergency medical care" and the Fifth Circuit's reasoning in *Robledo* make clear that not all treatment provided, even when a patient presents with a condition generally considered emergent, is "emergency medical care" protected by the statute.[104]

Thus, the critical question is not whether Decedent received some medical care in the emergency room during his February 12, 2024 visit. Rather, the question is whether the allegedly negligent conduct—the misdiagnosis and provision of Heparin—constitute the "provision of emergency medical care."[105] In disposing of this issue, the Court necessarily addresses the factual allegations but only to determine the legal sufficiency of the allegations, not the ultimate merits of the claim.

Here, Decedent initially presented at BAMC on February 11, 2024 complaining of an intense headache which had presented for several days.[106] The complaint does not set out the time of this visit, but the medical records show he was seen at 10:07 a.m. and released at 12:31 p.m. on

---

[103] *See, e.g.*, *Burleson v. Lawson*, 487 S.W.3d 312, 321 (Tex. App. 2016); *see also* Turner, 325 S.W.3d at 778.
[104] See *Robledo*, 147 F.4th at 520–21; TEX. CIV. PRAC. & REM. CODE § 74.001(a)(7).
[105] *See Robledo*, 147 F.4th at 520–21.
[106] Dkt. No. 15, at ¶ 4.1.

the same day with a possible diagnosis of sinusitis.[107] The discharge instructions specifically note that "there is no evidence of any life or limb threatening condition."[108] This visit is not at issue in this case, but one could certainly argue that the immediate resolution of this visit constitutes the provision of emergency medical care. This visit also sets the stage for the visit at issue.

As to the visit at issue, the complaint alleges that Decedent presented at BAMC on February 12, 2024 at 10:31 p.m. again complaining of a severe headache and nasal congestion.[109] Perhaps because of the February 11, 2024 visit, and the similarity of the symptoms, Decedent was not seen until almost three hours later, at 1:20 a.m. on February 13, 2024.[110] Both the Emergency Department Physician and the Staff Emergency Physician concluded that Decedent was most likely suffering from sinusitis.[111] The planned course of action was to treat the headache and sinusitis but test to "ensure no more serious pathology."[112] Thus, another CT scan was ordered but the CT scan did not occur until another three hours later, at 4:17 a.m.[113] The administration of Heparin followed at 6:13 a.m.[114]

Section 74.153(a) shields medical providers when they are engaged in the "provision of emergency medical care."[115] The statute defines emergency medical care in pertinent part as "bona fide emergency services provided after the sudden onset of a medical [] condition . . . such that the absence of immediate medical attention could reasonably" place the patient's health in serious jeopardy.[116] Here, the failure to assess Decedent for almost three hours after he first presented at

---

[107] Dkt. No. 11-1, at 11.
[108] *Id.*
[109] Dkt. No. 15, at ¶ 4.2.
[110] Dkt. Nos. 15, at ¶ 4.2; 11-1, at 1.
[111] Dkt. No. 11-1, at 6.
[112] *Id.*
[113] Dkt. No. 15, at ¶ 4.2.
[114] Dkt. No. 15, at ¶ 4.3.
[115] TEX. CIV. PRAC. & REM. CODE § 74.153(a).
[116] TEX. CIV. PRAC. & REM. CODE § 74.153(a).

BAMC on February 12, 2024 contraindicates that BAMC was providing emergency medical care. In contrast to the February 11, 2024 visit when Decedent was seen and discharged within approximately two hours, on this visit Decedent was unattended for almost three hours. Neither the complaint nor the medical records indicate any "bona fide emergency services" were provided during those three hours. Apparently, the medical personnel saw no need for immediate medical attention, perhaps because the severe headache was no longer a sudden onset. Clearly, the statue is not intended to protect all care provided in the emergency room as the term "emergency" would thus be superfluous. BAMC's failure to assess Decedent for three hours, failure to conduct a CT scan for another three hours, and failure to administer Heparin for another 2 hours all indicate BAMC was providing ordinary medical care, not emergency medical care.

Based on these pleadings and the medical records provided by the United States, the Court cannot conclude that the care at issue constituted emergency medical care shielded from ordinary negligence liability by § 74.153 as a matter of law. Based on the facts alleged in this case, whether the alleged misdiagnosis and treatment decisions fell within an emergency care context is a merits-based question more appropriately resolved on a fuller evidentiary record with the benefit of expert testimony. Accordingly, the Court finds that Plaintiffs have pleaded facts of ordinary medical care to support a negligence claim plausible enough to survive the pleading stage.

## V. CONCLUSION AND HOLDING

Accordingly, Defendant The United States of America's Motion to Dismiss is **DENIED**.

IT IS SO ORDERED.
DONE this 29th day of May, 2026, in San Antonio, Texas.

_____
MICAELA ALVAREZ
SENIOR UNITED STATES DISTRICT JUDGE